

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. PD-0306-14

**THE STATE OF TEXAS**

**v.**

**DAVID VILLARREAL, Appellee**

---

**ON STATE'S MOTION FOR REHEARING
AFTER OPINION ON DISCRETIONARY REVIEW
FROM THE THIRTEENTH COURT OF APPEALS
NUECES COUNTY**

---

**YEARY, J., filed a dissenting opinion in which KELLER, P.J., joined.**

### DISSENTING OPINION

Drunk driving is a scourge on our roadways. The carnage and destruction that drunk drivers inflict on their fellow citizens is enough, the United States Supreme Court has said, to justify programmatic checkpoints by which every driver may be briefly detained (that is to say, minimally *seized* for Fourth Amendment purposes) to investigate whether they may be driving while intoxicated. *Michigan Department of State Police v. Sitz*, 496 U.S. 444 (1990). But the same consideration does not justify the incrementally greater intrusion

inherent in a blood draw (a *search* for Fourth Amendment purposes—and a search of the *person*, which is just a step below that so-called "first among equals," the search of the person's *house*)[1] without first obtaining a warrant, if practicable. *Schmerber v. California*, 384 U.S. 757 (1966). Neither does the indisputable fact that evidence of intoxication steadily dissipates from the driver's bloodstream over time categorically justify application of the exigent circumstances exception to the warrant requirement—at least not for the run-of-the-mill DWI offender. *Missouri v. McNeely*, 133 S.Ct. 1552 (2013).[2]

In my view, however, the whole constitutional calculus changes once the offender has proven himself to be an incorrigible drunk driver. In that instance, the fact of numerous prior convictions for DWI, along with the officer's probable cause to believe the offender has struck yet again, may reasonably take the place of the objective assessment that a magistrate's warrant would otherwise provide. Moreover, the gravity of the recidivist's offense and his evident incorrigibility makes it all the more imperative that the best evidence

---

[1] *Compare Florida v. Jardines*, 133 S.Ct. 1409, 1414 (2013) ("[W]hen it comes to the Fourth Amendment, the home is first among equals.") *with Wyoming v. Houghton*, 526 U.S. 295, 303 (1999) (recognizing "the unique, significantly heightened protection afforded against searches of one's person").

[2] This Court is bound, of course, by the United States Supreme Court's construction of the Fourth Amendment. And indeed, my quarrel is not with the holding of *McNeely* itself, with which I am inclined to agree. In any given year, as many as 1.4 million people are arrested in this country for driving while intoxicated. *See, e.g.*, FED. BUREAU OF INVESTIGATION, ESTIMATED NO. OF ARRESTS, ARREST TABLE 29 (2010), https://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s.-2010/tables/10tbl29.xls (reporting more than 1.4 million arrests for driving while intoxicated in the year 2010). I do not disagree that to subject every one of them to the indignity of a compelled blood draw without the intervention of the detached judgment of a neutral magistrate should be deemed unreasonable for Fourth Amendment purposes.

of intoxication not be lost in the time it usually takes to secure a warrant. For this combination of reasons, I would hold that, to the extent that Section 724.012(b)(3)(B) of the Texas Transportation Code requires a peace officer to draw blood samples from incorrigible DWI suspects, TEX. TRANSP. CODE § 724.012(b)(3)(B), regardless of whether the peace officer first seeks a search warrant, it operates in a constitutionally acceptable manner. Because the Court rescinds its grant of the State's motion for rehearing in this case without even seriously considering this proposition, I respectfully dissent.

## INTRODUCTION:  THE INCORRIGIBLE DRUNK DRIVER

The compelled extraction of blood from the human body for purposes of conducting an evaluation of blood-alcohol concentration is unquestionably a search for Fourth Amendment purposes. *Skinner v. Railway Labor Exec. Assn*, 489 U.S. 602, 616 (1989) (citing *Schmerber*, 384 U.S. at 767-68); *Maryland v. King*, 133 S.Ct. 1958, 1969 (2013). Indeed, "[t]he ensuing chemical analysis of the sample to obtain physiological data is a further invasion of the tested [individual's] privacy interests." *Skinner*, 489 U.S. at 616. "Such an invasion of bodily integrity implicates an individual's 'most personal and deeply-rooted expectations of privacy.'" *McNeely*, 133 S.Ct. at 1558 (quoting *Winston v. Lee*, 470 U.S. 753, 760 (1985)). Particularly in the context of criminal investigations, "[s]earch warrants are ordinarily required  . . . absent an emergency . . . where intrusions into the human body are concerned." *Schmerber*, 384 U.S. at 770.

To be sure, the "exigent circumstances" exception to the warrant requirement may

apply even in a typical drunk driving case, since, with the passage of time and "the human body's natural metabolic processes," the alcohol level in an individual's blood will change and its evidentiary value will diminish. *McNeely*, 133 S.Ct. at 1560. But, as the Supreme Court recently determined in *McNeely*, this "natural dissipation" of critical evidence does not justify an absolute rule whereby the police may invariably draw blood without a warrant in every case in which they have probable cause to believe a driver has been driving while intoxicated. *Id*. at 1568.

Still, *McNeely* does not represent the final word on the need for a warrant to take blood for alcohol testing in the universe of all DWI cases. After all, even in the context of searches of the person, "the ultimate measure of the constitutionality of a governmental search is 'reasonableness.'" *King*, 133 S.Ct. at 1969 (quoting *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 652 (1995)). In this vein, I take the holding of *McNeely* to be no broader than the articulation given to it by Justice Kennedy, who supplied the fifth and deciding vote, in his concurring opinion: "[T]he instant case . . . does not provide a framework where it is prudent to hold any more than that always dispensing with a warrant for a blood test when a driver is arrested for being under the influence of alcohol is inconsistent with the Fourth Amendment." *McNeely*, 133 S.Ct. at 1569 (Kennedy, J., concurring).

Justice Kennedy went on to insist that this "general proposition . . . ought not to be interpreted to indicate this question is not susceptible of rules and guidelines that can give

important practical instructions to arresting officers, instructions that in any number of instances would allow a warrantless blood test in order to preserve the critical evidence." *Id*. I believe the rules and guidelines to which Justice Kennedy alluded may include, in keeping with the Fourth Amendment, a determination by the Legislature that particular circumstances will not only justify, but will in fact *mandate,* a blood draw, irrespective of the existence of a warrant, in order to preserve the best evidence of a very serious crime. So long as those legislatively-prescribed circumstances are themselves sufficient to render the search of the person, though warrantless, categorically "reasonable" in contemplation of the Fourth Amendment, such a statute should be respected and followed. By mandating blood draws for incorrigible DWI offenders, that is, in my view, what Section 724.012(b)(3)(B) of the Transportation Code has done, and I would uphold it as *not* "inconsistent" with the Fourth Amendment, which ultimately secures the people only against searches that are, after all, "unreasonable." The Court should take the State's motion for rehearing as an occasion to say why it believes I am wrong, rather than to summarily un-grant a meritorious motion.

## I. REASONABLENESS IS THE TOUCHSTONE

The Fourth Amendment provides, in relevant part, that "[t]he right of the people to be secure in their persons . . . against unreasonable searches . . . shall not be violated, and no Warrants shall issue, but upon probable cause[.]" U.S. CONST. amend. IV. In *Riley v. California*, the United States Supreme Court recently summarized the state of its holdings with respect to searches undertaken in the context of criminal investigations:

> As the text makes clear, the ultimate touchstone of the Fourth Amendment is reasonableness. Our cases have determined that where a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, reasonableness generally requires the obtaining of a judicial warrant. Such a warrant ensures that the inferences to support a search are drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement.

134 S.Ct. 2473, 2482 (2014) (internal citations, quotation marks, brackets, and ellipses omitted).[3] Seizing upon this language from *Riley*, as well as similar language in *McNeely*, this Court on original submission declared that it was bound by the presumption that a search of the person must be supported by a warrant unless the circumstances called for application of an already well-established exception. *See State v. Villarreal*, ___ S.W.3d ___, 2014 WL 6734178, at *17(Tex. Crim. App. del. Nov. 26, 2014) ("The Supreme Court has made clear that, in the context of an active criminal investigation, and when the primary goal of law-enforcement activity is the gathering of evidence, a warrantless search of a person is unreasonable unless it falls within an established exception to the warrant requirement.").[4]

But has the Supreme Court really made this proposition so clear? I do not believe the

---

[3] *Riley* involved a question of whether the warrantless search of cell phones for evidence of criminal activity could be upheld under the search-incident-to-arrest exception to the warrant requirement. The Supreme Court ultimately determined that the rationale for that exception did not extend to defeat the enhanced expectation of privacy inherent in the personal content of a modern-day cellular telephone.

[4] *See also Ferguson v. City of Charleston*, 532 U.S. 67, 74 n.7 & 78 (2001) (tracing the development of so-called "special needs" cases and seeming to disown "a balancing test" in the context of "the normal need for law enforcement").

presumption in favor of warrants is as monolithic as the Court made it out to be on original submission. Examples abound of cases involving criminal investigations in which the Supreme Court has not automatically resorted to the presumption that a search must be supported by a warrant in the absence of some already well-established exception. Often a question arises with respect to the proper scope of a seemingly well established exception. In this context, the Supreme Court has not hesitated to apply a more generalized approach to "reasonableness," one which simply balances the State's particular interest in law enforcement against the citizen's particular expectation of privacy. And it has done so not *just* in the context of cases involving administrative searches or suspicionless programmatic searches (the so-called "special needs" cases),[5] but *also* in the context of cases that involve, as this Court characterized it on original submission, "an active criminal investigation[.]" *Villarreal*, 2014 WL 6734178, at \*17.

For instance, in *Wyoming v. Houghton*, 526 U.S. 295 (1999), the Supreme Court addressed the proper scope of the so-called automobile exception to the warrant requirement. The specific question was whether the automobile exception—the rule that probable cause to search an automobile for contraband authorizes a warrantless search of any container therein that might feasibly contain that contraband—ought to embrace a warrantless search

[5] Describing such "special needs" cases, the Supreme Court has observed that "[w]e have upheld suspicionless searches and seizures to conduct drug testing of railroad personnel involved in train accidents; to conduct random drug testing of federal customs officials who carry arms or are involved in drug interdiction; and to maintain automobile checkpoints looking for illegal immigrants and contraband, and drunk drivers." *Vernonia School District 47J*, 515 U.S. 646, 653-54 (1995).

of a passenger's personal belongings, namely, the passenger's purse. *Id*. at 297. Though

*Houghton* clearly involved a criminal investigation, the Supreme Court nonetheless declared

that the proper approach to the question was to

> evaluate the search . . . under traditional standards of reasonableness by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.

*Id*. at 300. Ultimately holding that the automobile exception should indeed extend to justify

a warrantless search of the passenger's purse, the Supreme Court observed along the way that

the competing interests "militate in favor of the needs of law enforcement, and against a

personal-privacy interest that is ordinarily weak." *Id*. at 306.

And in *Riley* itself, the Supreme Court again resorted to the generalized balancing test,

this time in order to determine the appropriate scope of the search-incident-to-arrest

exception to the warrant requirement during a criminal investigation. The Supreme Court

acknowledged that "a mechanical application" of its precedents in this area "might well

support the warrantless search" of the defendant's cell phone following his arrest. 134 S.Ct.

at 2484. But, rather than fall back on such a rote application, the Supreme Court invoked

*Houghton*, once again to declare:

> [W]e generally determine whether to exempt a given type of search from the warrant requirement "by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests."

*Id*. (quoting *Houghton*, 526 U.S. at 300). Re-evaluating the competing interests that are at

stake when it comes to cell phones, the Supreme Court concluded that the search-incident-to-arrest exception to the warrant requirement should not control and that, absent some other valid exception, the Fourth Amendment requires a warrant. *Id*. at 2484-91.[6]

---

[6] Another case involving a criminal investigation that conducts a balancing approach to measure personal privacy against governmental interest in order to determine the legitimate scope of an exception to the general warrant requirement is *Georgia v. Randolph*, 547 U.S. 103, 114-20 (2006). The question in *Randolph* was whether investigating police officers could enter a home with the consent of one co-occupant when another co-occupant—the defendant—was also present who objected to the entry. *Id*. at 106. Concluding that such a warrantless intrusion would be unreasonable for Fourth Amendment purposes, the Supreme Court observed that, "in the balancing of competing governmental interests entailed by the bar to unreasonable searches, the cooperative occupant's invitation adds nothing to the government's side to counter the force of an objecting individual's claim to security against the government's intrusion into his dwelling place." *Id*. at 114-15 (citation omitted). The objecting occupant's right to privacy in his home is substantial, the Supreme Court continued, and "the State's other countervailing claims do not add up to outweigh it." *Id*. at 115. The Supreme Court concluded that "nothing in social custom or its reflection in private law argues for placing a higher value on delving into private premises to search for evidence in the face of disputed consent, than on requiring clear justification before the government searches a private living quarters over a resident's objection." *Id*. at 120.

Although less pertinent here, the Supreme Court has also engaged in the general balancing approach in other criminal-investigation cases that involve, essentially, the question whether some *new* exception to the warrant requirement should be recognized. For example, in *Illinois v. McArthur*, 531 U.S. 326 (2001), the question was whether it was "reasonable" under the Fourth Amendment to prevent a suspect from entering his home, absent a warrant, for the time it would take investigating officers to obtain a search warrant for the house itself. *Id*. at 329. Instead of applying a presumption that a warrant should be obtained absent some well-established exception, the Supreme Court chose to "balance the privacy-related and law enforcement-related concerns to determine if the intrusion was reasonable." *Id*. at 331. Considering all the circumstances, including the possibility that McArthur would destroy the contraband that was the subject of the search warrant if not detained, the Supreme Court held that the detention was, indeed, a "reasonable" seizure under the Fourth Amendment. *Id*. at 332. It concluded that, "[g]iven the nature of the intrusion and the law enforcement interest at stake, this brief seizure of the premises was permissible." *Id*. at 333.

Also in *United States v. Knights*, 534 U.S. 112 (2001), the Supreme Court similarly evaluated the constitutionality of a search conducted in the course of a focused criminal investigation. The suspect under investigation, Knights, happened to be on probation, and the investigating officer used his probationary status as a justification for conducting a warrantless search of his apartment for evidence of a suspected crime. *Id*. at 114-15. The issue in the case was whether the Fourth

Both *Houghton* and *Riley* involved a question about the proper scope of an exception to the warrant requirement in the context of a criminal investigation. *McNeely* similarly involved the question of the proper scope of such an exception: the exigent circumstances exception. But, because of the unyielding approach taken by the State of Missouri, the Supreme Court did not have to conduct a general balancing analysis in *McNeely*. By arguing that dissipation of blood alcohol levels in the blood invariably presents a sufficient exigent circumstance in *every* case of driving while intoxicated—no matter the other attending circumstances—Missouri presented a proposition that was essentially binary in nature and could be answered in an equally binary fashion: a simple "yes" or "no." The Supreme Court answered "no": "In short, while the natural dissipation of alcohol in the blood may support a finding of exigency in a specific case, as it did in *Schmerber*, it does not do so categorically." 133 S.Ct. 1563. The Supreme Court in *McNeely* did *not* have to go further and ask itself whether any *particular* set of circumstances beyond the brute fact of evidence-dissipation might reasonably support an exemption from the general warrant requirement.

---

Amendment would tolerate such a search when it was conducted pursuant to a condition of probation requiring probationers to submit to warrantless searches. *Id.* at 116. The Supreme Court once again analyzed the question "under our general Fourth Amendment approach of 'examining the totality of the circumstances,' with the probation search condition being a salient circumstance." *Id.* at 118 (citing *Ohio v. Robinette*, 519 U.S. 33, 39 (1996)). As in *Houghton*, the Supreme Court declared that the reasonableness of a warrantless search should be determined by balancing the degree of intrusion upon the suspect's privacy interest against the degree to which it promotes a legitimate government interest. *Id.* at 118-19. The Supreme Court expressly cautioned that it was *not* conducting a "special needs" analysis as it had done previously in *Griffin v. Wisconsin*, 483 U.S. 868 (1987)—and yet, it still applied its general balancing analysis to the question of the validity of the warrantless search, upholding it. *Id.* at 117-19.

Had it been confronted with such an issue of scope, there is no reason to doubt the Supreme Court would have undertaken the same balancing approach as it did in *Houghton* and *Riley*, to determine whether exigent circumstances might, under those particular circumstances, justify a warrantless search of the DWI offender's person.

For these reasons, I believe the Court on original submission should have acknowledged that the general balancing approach is appropriate in this case, notwithstanding *McNeely*. I would urge the Court to conduct that balancing analysis and, having conducted it, conclude that the balance tips in the State's favor. After a brief exposition of the statutory scheme, I will devote my efforts to explaining why I believe that is the right conclusion.

## II. THE STATUTORY SCHEME

Even when operated normally, an automobile can be a dangerous implement; in the wrong hands, it can be a deadly weapon. *Walker v. State*, 897 S.W.2d 812, 814 (Tex. Crim. App. 1995). Because we all must share the public roadways, driving is a highly regulated activity—a privilege, not a right. See *Texas Department of Public Safety v. Richardson*, 384 S.W.2d 128, 132 (Tex. 1964) ("It is clear that one making use of the highways of the state is exercising a privilege which is subject to regulation."); *Davison v. State*, 166 Tex. Cr. R. 376, 381, 313 S.W.2d 883, 886 (1958) (opinion on State's motion for reh'g) (driving "is a privilege and not a right"). Most drivers understand this, having passed an examination before receiving a license, and having been pulled over for a driving infraction at some point

if they have been licensed for any period of time at all.

Texas is a so-called "implied consent" state. *See McNeely*, 133 S.Ct. at 1566 (plurality opinion) ("[A]ll 50 states have adopted implied consent laws[.]"). This means that Texas has adopted a statutory scheme whereby any person who has been arrested for driving while intoxicated is "deemed to have consented" to the taking of a breath or blood specimen for a determination of his blood-alcohol concentration. TEX. TRANS. CODE § 724.011(a).[7] Accordingly, a breath or blood specimen "may" be taken if the DWI offender accedes to an arresting officer's "request." TEX. TRANSP. CODE § 724.012(a)(1).[8] Despite these so-called "implied consent" provisions, however, an arresting officer may not *compel* the taking of such a specimen from the ordinary first- or second-time DWI offender who simply refuses to submit. TEX. TRANS. CODE § 724.013.[9] Under these circumstances, the officer must obtain a search warrant. In *Beeman v. State*, 86 S.W.3d 613, 616 (Tex. Crim. App. 2002), this Court recognized that implied consent is just one way an officer can seek to obtain a blood or breath specimen; if the first- or second-time DWI offender refuses to give consent in fact,

[7] "If a person is arrested for an offense arising out of acts alleged to have been committed while the person was operating a motor vehicle in a public place . . . while intoxicated, . . . the person is deemed to have consented, subject to this chapter, to submit to the taking of one or more specimens of the person's breath or blood for analysis to determine the alcohol concentration[.]"

[8] "One or more specimens of a person's breath or blood may be taken if the person is arrested and at the request of a peace officer having reasonable grounds to believe the person . . . while intoxicated was operating a motor vehicle in a public place[.]"

[9] "Except as provided by Section 724.012(b), a specimen may not be taken if a person refuses to submit to the taking of a specimen designated by a peace officer." The driver's refusal has adverse consequences, of course—the suspension of his driving privileges and the use of his refusal against him upon subsequent prosecution. TEX. TRANS. CODE §§ 724.035, 724.061.

the officer can still go beyond the statutory scheme and seek a search warrant to compel the taking of a specimen of breath or blood consistent with the Fourth Amendment. But nothing in the statutory scheme requires the officer either to ask for a specimen or to seek a warrant to compel a specimen in the case of the ordinary DWI offender.

That is not the case under Section 724.012(b)(3)(B) of the Transportation Code. Under this provision, the DWI suspect with at least two prior DWI convictions does not have the same statutorily granted ability to refuse consent as does the first- and even the second-time offender. TEX. TRANS. CODE §§ 724.012(b)(3)(B). That is because the statutory scheme leaves the arresting officer no room for discretion; once he has "arrest[ed]" a suspect for DWI and he "possesses or receives reliable information" that he is a three-time (or more) DWI offender, the officer "shall require the taking of a specimen"—without exception. *Id.*; TEX. TRANSP. CODE § 724.013. Nothing in Section 724.012(b) explicitly speaks to whether the arresting officer needs first to seek to obtain a warrant before taking the required specimen. Nor does Section 724.012(b) spell out any particular contingencies, apart from the fact of a new arrest and the discovery of at least two prior DWI convictions, that would serve to relieve the arresting officer of having to obtain a warrant. Rather, it unequivocally requires the arresting officer to compel the three-time DWI offender to submit to a specimen of breath or blood, regardless of whether the officer has obtained a warrant or whether any previously well-established exception to the warrant requirement might be found to apply under the circumstances of the particular case.

Thus, while the arresting officer in the run-of-the-mill DWI case has some measure of discretion in deciding whether to seek a specimen for blood-alcohol analysis, this is not so when it comes to his investigation of the incorrigible DWI offender. The evident legislative intent of Section 724.012(b)(3)(B) is to eliminate the arresting officer's choice whether to obtain such a specimen from an incorrigible DWI offender. He simply must do so. Indeed, even if he seeks a warrant and the neutral and detached magistrate declines to issue it, the statute still requires the officer to take the specimen. In this sense, at least—by mandating the taking of a blood or breath specimen from every incorrigible DWI offender, without exception—the statute authorizes warrantless searches of the body of the incorrigible DWI offender.

So the question arises: Does the Fourth Amendment tolerate a legislative judgment that the exigency inherent in the loss of BAC evidence with the passage of time justifies the authorization of a warrantless blood draw to combat the manifest dangers presented by the incorrigible DWI offender? I believe that the Legislature's judgment would pass the Supreme Court's general balancing test for Fourth Amendment reasonableness.

### III.  THE BALANCE OF INTERESTS

### A.  Preamble: The Purpose of the Warrant Requirement

"An essential purpose of a warrant requirement is to protect privacy interests by assuring citizens subject to a search or seizure that such intrusions are not the random or arbitrary acts of government agents." *Skinner*, 489 U.S. at 621-22 (citing, among other cases,

*United States v. Chadwick*, 433 U.S. 1, 9 (1977)—a case involving a focused criminal investigation). A warrant also provides the detached scrutiny of a neutral magistrate, and thus ensures an objective determination whether an intrusion is justified in any given case." *Id*. at 622. But a warrantless search or seizure may yet be reasonable under the Fourth Amendment when, under a particular scenario, "a warrant would do little to further these aims." *Id*. Moreover, the Supreme Court has proclaimed that "the government's interest in dispensing with the warrant requirement is at its strongest when . . . the burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search." *Id*. (internal quotation marks and citations omitted). This is particularly true when "the delay necessary to procure a warrant . . . may result in the destruction of valuable evidence." *Id*. When "imposing a warrant requirement . . . would add little to the assurances of certainty and regularity already afforded by [a particular regulatory regime], while significantly hindering, and in many cases frustrating," the State's objectives, a warrant is not "essential" to assure the reasonableness of that regime under the Fourth Amendment. *Id*. at 624. I evaluate the constitutional validity of Texas's "implied consent" statutory regime with these principles foremost in mind.

## B. Query: Is the Purpose of a Warrant Already Served?

A DWI offender may be arrested without a warrant, consistent with the Fourth Amendment, so long as the arresting officer has probable cause to believe he has committed that offense. *See Gerald Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) ("In conformity with

the rule at common law, a warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed."). Thus, the DWI offender's interest in not being bodily *seized* is not so weighty as to require the intervention of a magistrate to independently evaluate probable cause. Is his incremental interest in not also being *searched* sufficiently weighty as to invoke the protections of a magistrate to evaluate the officer's assessment of probable cause? That depends upon the nature and scope of the search: a warrantless search of the person incident to arrest, limited to immediately assuring the officer's safety and/or to preserving evidence that could be destroyed, is ordinarily reasonable. *Riley*, 134 S.Ct. at 2483-84. Indeed, even in the absence of a formal arrest, a warrantless search of the person may be reasonable if the State's objective is to preserve "highly evanescent evidence." *Cupp v. Murphy*, 412 U.S. 291, 296 (1973) (citing, of all things, *Schmerber*).[10]

The State unquestionably has an abiding and compelling interest in stemming the tide of drunk driving: "No one can seriously dispute the magnitude of the drunken driving problem or the States' interest in eradicating it." *Sitz*, 496 U.S. at 451. But when it is balanced against the DWI offender's privacy interest to avoid a search that involves puncturing both the skin and a blood vessel in order to obtain his blood—even for the sake

---

[10] In *Cupp v. Murphy*, the Supreme Court concluded that a pre-arrest warrantless search of Murphy's fingernails was justified because: 1) Murphy was aware that police suspected him of an offense, giving him a motive to destroy evidence; 2) he refused to consent to fingernail scrapings; 3) he put his hands behind his back and rubbed them together; and then 4) he put them in his pockets, making "a metallic sound, such as keys or change rattling[.]" 412 U.S. at 296.

of preserving "highly evanescent evidence" of the level of alcohol in his bloodstream at time of the offense—the State's interest is not sufficiently weighty to justify a categorical rejection of the warrant requirement. *See McNeely*, 133 S.Ct. at 1563 ("[W]hile the natural dissipation of alcohol in the blood may support a finding of exigency in a specific case, as it did in *Schmerber*, it does not do so categorically.").

At least in the ordinary DWI case, the State's interest in preserving evidence is simply not substantial enough to justify dispensing with the intervention of a magistrate, if practicable, to independently verify the existence of probable cause. In that context, the efficacy of the magistrate cannot be doubted to serve his constitutionally intended function to stand between the citizen and the constable to assure that an objective basis in fact exists to merit the incrementally greater intrusion that a blood draw constitutes—beyond the mere fact of custodial arrest—upon the person of the offender.

But when it comes to Texas's incorrigible-DWI-offender scheme, the intervention of a magistrate adds little of practical value. The assurance of a detached neutrality is already to a certain extent inherent in the statutory scheme. The authorization of a warrantless blood draw under Section 724.012(b)(3)(B) is triggered only by (1) an arrest and (2) the discovery of reliable information that the suspect has been *actually convicted on at least two previous occasions* for driving while intoxicated. In order to arrest the incorrigible DWI offender, the officer must find probable cause to believe the suspect has been driving while intoxicated—the same finding a magistrate would have to make later to authorize a blood

draw.[11] But once the officer also receives reliable information from a credible source that the suspected DWI offender has been convicted at least twice before for the same conduct, his current determination of probable cause is significantly bolstered by objective evidence of the offender's proven propensity to commit such a crime.[12] Because the prior convictions lend substantial credence to the officer's probable-cause-to-arrest determination, a magistrate would rarely find occasion to doubt the overall factual basis of the officer's conclusion that the suspect may very well have offended once again.[13]

It should also prove rare for a magistrate to find cause to doubt the objectivity of the information that the arresting officer had relied upon to establish the DWI suspect's past offenses. The arresting officer's "credible source," as required by the statute, is likely to be an official record, either conveyed to him by his dispatcher or memorialized on his squad car

---

[11] The officer's probable cause determination can be tested later in a motion to suppress, of course, and if that probable cause fails, the evidence from the blood draw should then be suppressed in any event as fruit of the poisonous tree. *See, e.g.*, *Monge v. State*, 315 S.W.3d 35, 40 (Tex. Crim. App. 2010) ("The 'fruit of the poisonous tree' doctrine generally precludes the use of evidence, both direct and indirect, obtained following an illegal arrest.").

[12] "[A] suspect's prior convictions . . . are not barred from consideration on the issue of probable cause." 2 Wayne R. LaFave, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 3.2(d), at 72-4 & n.147 (5th ed. 2012). *See Brinegar v. United States*, 338 U.S. 160, 172-78 (1947) (explaining that evidence of a suspect's criminal propensity, while it may be deemed inadmissible at trial for policy reasons, is no less pertinent to the probable cause determination).

[13] "[T]he citizen who has given no good cause for believing he is engaged in [criminal] activity is entitled to proceed on his way without interference. But one who recently and repeatedly has given substantial ground for believing that he is engaging in [similar criminal activity] has no such immunity[.]" *Brinegar*, 338 U.S. at 177. *See, e.g.*, *Commonwealth v. Rousseau*, 465 Mass. 372, 383-84, 990 N.E.2d 543, 553-54 (2013) (search warrant affidavit including information as to the suspects' "extensive criminal histories," was sufficient to supply probable cause).

computer—the same kind of source a magistrate would likely consult were he to stray beyond the four corners of the warrant affidavit in order to verify the information in a search warrant application. The suspect's status as a twice-convicted DWI offender is essentially an objective fact, one that is not realistically subject to the "often competitive" perspective of the investigating officer. *Riley*, 134 S.Ct. at 2482 (quoting Justice Jackson's famous turn of phrase in *Johnson v. United States*, 333 U.S. 10, 13-14 (1948)).[14] To insist on the intercession of a "neutral and detached" magistrate to rubber-stamp the officer's determination that there is probable cause to draw blood under these circumstances only elevates officious formalism over Fourth Amendment substance.

## C. Appellee's Expectation of Privacy

Both the forced extraction of blood and any subsequent chemical analysis thereof constitute discrete invasions of privacy that are subject to Fourth Amendment protection. *Skinner*, 489 U.S. at 616. Just how weighty are these privacy interests? Though not so "gentle [a] process" as the mere "light touch on the inside of the cheek" involved in taking a buccal swab for DNA purposes, *King*, 133 S.Ct. at 1969, blood draws are nonetheless "a commonplace in these days of periodic physical examinations and experience with them teaches that the quantity of blood extracted is minimal, and that for most people the

---

[14] "The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable mean draw from the evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime."

procedure involves virtually no risk, trauma, or pain." *Schmerber*, 384 U.S. at 771 (footnote omitted). "*Schmerber* thus confirmed 'society's judgment that blood tests do not constitute an unduly extensive imposition on an individual's privacy and bodily integrity.'" *Skinner*, 489 U.S. at 625 (quoting *Winston v. Lee*, 470 U.S. at 762). Our statutory scheme ensures that any risk, trauma, or pain will be minimized, requiring that the blood extraction be performed by a qualified expert "in a sanitary place." TEX. TRANSP. CODE § 724.017(a) & (a-1); *Krause v. State*, 405 S.W.3d 82 (Tex. Crim. App. 2013).

Moreover, the mandatory blood draw provisions of Section 724.012(b) do not kick in unless and until "the officer arrests" the offender. TEX. TRANSP. CODE § 724.012(b). "The expectations of privacy of an individual taken into police custody necessarily are of diminished scope." *King*, 133 S.Ct. at 1978 (citation, internal quotation marks, and brackets omitted).[15] Thus, any search of the person of the DWI offender by taking a specimen of his blood is but an incrementally greater intrusion than that which is already permitted without a warrant, so long as probable cause to arrest exists.

Finally, with respect to the blood-draw analysis, the only private information the State

---

[15] Still, I doubt that the Supreme Court would automatically extend the search-incident-to-arrest exception to the warrant requirement to every DWI blood draw. *Cf. Riley*, 134 S.Ct. at 2488 ("The fact that an arrestee has diminished privacy interests does not mean that the Fourth Amendment falls out of the picture entirely.") Otherwise, *McNeely* itself might have been decided on the basis that a warrantless search incident to arrest for DWI may include a blood draw, in order to secure evidence from destruction. Instead, the Supreme Court held that the potential for the destruction of evidence did not excuse the State from seeking a warrant where, on the facts of the particular case, one could be obtained without risking a significant loss of evidence—at least for the ordinary DWI offender. 133 S.Ct. at 1561.

seeks to obtain is "evidence of the alcohol concentration or presence of a controlled substance, drug, dangerous drug, or other substance[.]" TEX. TRANSP. CODE § 724.064. Nothing in Chapter 724 of the Transportation Code contemplates that the suspect's blood will be analyzed for any other purpose. Thus, the State conducts no additional testing to determine "whether [Appellee] is, for example, epileptic, pregnant, or diabetic." *King*, 133 S.Ct. at 1979 (quoting *Vernonia School Dist. 47J*, 515 U.S. at 658). The search of the blood itself is sharply focused, and the revelation of personal information is circumscribed and quite limited.

None of this is to deny that a DWI offender's interests are not of the "most personal" nature, implicating "deep-rooted expectations of privacy." *McNeely*, 133 S.Ct. at 1558 (quoting *Winston v. Lee*, 470 U.S. at 760). But the insult to bodily integrity inherent in the blood draw contemplated by Section 724.012(b) is relatively benign, the offender is legitimately under arrest at the time, and the extraction of private information from an analysis of that blood is not indiscriminate, revealing only potentially incriminating information relevant to driving while intoxicated, and nothing extraneous.[16]

### D. The State's Interest

### 1. Combating DWI Incorrigibility

---

[16] It should be noted that I do not regard the recidivist DWI offender's incorrigibility as a factor that reduces his expectation of privacy. Unless he is still on probation or parole for one of his previous DWI convictions, he is not in the constructive custody of the State, and so he does not suffer the reduction of privacy that a probationer (*Knights*, 534 U.S. at 119-20) or a parolee (*Samson*, 547 U.S. at 850-52) does. Rather, the fact that Appellee is an established DWI recidivist is properly regarded as a factor to be considered on the State's-interest side of the ledger.

I need not dwell long on the abiding legitimacy of the State's interest. To begin with, "there is no denying the fact that there is a very strong societal interest in dealing effectively with the problem of drunken driving." 5 Wayne R. LaFave, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT §10.8(d), at 429 (5th ed. 2012). Texas is not immune to the problem. In 2014 alone, officers state-wide made 70,569 arrests for driving under the influence. TEX. DEP'T. OF SAFETY, TEXAS ARREST DATA (2014) http://www.txdps.state.tx.us/ crimereports/14/citCh9Add.pdf. There were a total of 925 intoxication-related collisions involving fatalities in that same year, resulting in the deaths of 1,041 people—and this is over and above the 2,328 incapacitating injuries. TEX. DEP'T. OF TRANSP., TOTAL AND DUI (ALCOHOL) FATAL AND INJURY CRASHES COMPARISON (2014) http://ftp.dot.state.tx.us/pub/ txdot/trf/crash-statistics/2014/37.pdf. In addition to the carnage that driving while intoxicated inflicts, the resulting property damage is estimated to be in the neighborhood of 43 billion dollars annually nationwide. L.J. Blincoe, T.R. Miller, E. Zaloshnja, & B.A. Lawrence, U.S. DEP'T. OF TRANSP., NAT'L. HIGHWAY SAFETY ADMIN., THE ECONOMIC AND SOCIETAL IMPACT OF MOTOR VEHICLE CRASHES 166 (2015), http://www-nrd.nhtsa.dot.gov/pubs/ 812013.pdf. These numbers are simply mind-boggling.

But even more is at stake here than ordinary DWI deterrence—a weighty enough consideration in its own right. Society also has at least a "substantial" interest in "combating recidivism." *Samson v. California*, 547 U.S. 843, 853 (2006).[17] In *United States v. Knights*,

---

[17] In *Samson*, the Supreme Court once again applied the general balancing approach to resolve the question of whether a condition of release on parole (as opposed to probation, as was the

534 U.S. 112 (2001), the Supreme Court expressly highlighted the Government's legitimate interest in curtailing recidivism in persons placed on probation, alluding to the "the concern, quite justified, that [they] will be more likely to engage in criminal conduct than an ordinary member of the community." *Id*. at 120-21. The Supreme Court concluded that the Government's "interest in apprehending violators of the criminal law, thereby protecting potential victims of criminal enterprise, may therefore justifiably focus on probationers in a way that it does not on the ordinary citizen." *Id*. at 121.[18] When balanced against a probationer's "significantly diminished" expectation of privacy, *id*. at 120, the Government's interest was deemed weighty enough to justify a holding that "the warrantless search . . . supported by reasonable suspicion and authorized by a condition of probation, was reasonable within the meaning of the Fourth Amendment." *Id*. at 122. The State's general interest in combating recidivism is also frequently weighty enough, all by itself, to "warrant privacy intrusions that would not otherwise be tolerated under the Fourth Amendment." *Samson*, 547 U.S. at 853.

In Section 724.012(b)(3)(B), the Legislature has effectively combined these two

___

issue in *Knights*) "can so diminish or eliminate a released prisoner's reasonable expectation of privacy that a suspicionless search by a law enforcement officer would not offend the Fourth Amendment." 547 U.S. at 847. In weighing the State's-interest side of the balance, the Supreme Court emphasized "the grave safety concerns that attend recidivism." *Id*. at 854. *See also Griffin v. Wisconsin*, 483 U.S. at 875 (noting the State's interest in the intensive supervision of probationers to "reduce recidivism").

[18] The Supreme Court would later reiterate in *Sampson* that "a State's interests in reducing recidivism and thereby promoting reintegration and positive citizenship among probationers and parolees warrant privacy intrusions that would not otherwise be tolerated under the Fourth Amendment." 547 U.S. at 853.

already-weighty interests: DWI in general, and the interest in combating recidivism. Moreover, the statute addresses these combined interests in a particularly efficacious way, targeting the repeated commission of a particularly pernicious offense. The blood draw is triggered only when there is credible information that the DWI suspect is *in fact* a multiple recidivist for whom there is probable cause to believe he has offended yet again. In this way, it constitutes a measured approach to the DWI problem, tailored to the most obvious peril: the intractable drunk driver—he who is most likely to endanger us all by *continuing* to re-offend. The offender who has already been convicted two or more times poses the direst threat, for he has shown himself, by his lack of self-control, to be the most apt to wreak havoc on life, limb, and property in the future. It is from him that society most needs to protect itself—and *does*, as illustrated by the enhanced punishments imposed upon repeat offenders enumerated in Section 49.09 of the Texas Penal Code. TEX. PENAL CODE § 49.09.[19] By merging (1) society's legitimate concern to deter driving while intoxicated in general with (2) the heightened risk that the incorrigible DWI offender presents, Section 724.012(b)(3)(B) of the Transportation Code serves to vindicate a State's interest of the highest order.

### 2. Exigent Circumstances and the Gravity of the Offense

Tyler McNeely was himself a repeat DWI offender. 133 S.Ct. at 1557 n.1. Even so, the Supreme Court in *McNeely* refused to take the inescapable fact that alcohol concentration

---

[19] Notable among Texas's self-protective measures is the statutory subjection of the most incorrigible offenders to a lock-out device that prevents them from driving "if ethyl alcohol is detected" on their breath. *Id*. § (h).

dissipates from the bloodstream with the passage of time as a sufficient exigency to justify a blanket exception to the warrant requirement. But the State of Missouri did not argue that either the gravity of the offense or McNeely's particular status as a re-offender were relevant considerations in the exigent-circumstances calculation. Brief for Petitioner, Missouri v. McNeely, 133 S.Ct. 1552 (2013) (No. 11-1425), 2012 WL 5532197. Nor did the Supreme Court mention these considerations, much less factor them into its analysis, when it rejected Missouri's suggested categorical approach.[20]

As far as I am concerned, Appellee's status as an incorrigible DWI offender makes all the difference. Exigency may reasonably be measured on a sliding scale. The more dire the threat confronting society, the more latitude the State must be granted to counter that societal threat. It is therefore eminently reasonable for the State to respond to the manifest danger that the incorrigible DWI offender poses by pursuing, not just arguably sufficient evidence, but the best evidence it can possibly muster against him.

We are used to thinking of the destruction of evidence as an exigency that operates

---

[20] On original submission, this Court observed:

> *McNeely* reaffirmed the principle that a compelled physical intrusion beneath the skin to obtain evidence in a criminal investigation implicates significant privacy interests, and this privacy interest is not automatically diminished simply because an individual is suspected of a serious DWI offense. *McNeely*, 133 S.Ct. at 1558.

*Villarreal*, 2014 WL 6734178, at *18. This observation is accurate right up until it gets to the word "serious." Nowhere on page 1558 of *McNeely* does the word "serious" even appear. In any event, while it may be true that the seriousness of the offense does not diminish the DWI suspect's privacy interest, *see* note 16, *ante*, it may yet be a factor on the State's side of the balance to justify a warrantless search, since "the gravity of the offense" is "an important factor to be considered when determining whether any exigency exists[.]" *Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984).

exclusively as a function of time: "Where there are exigent circumstances in which police action must be 'now or never' to preserve the evidence of a crime, it is reasonable to permit action without prior judicial evaluation." *Roaden v. Kentucky*, 413 U.S. 496, 505 (1973). It is thus the "*ready* destructibility" of evidence that justifies dispensing with the involvement of a magistrate. *Cupp v. Murphy*, 412 U.S. at 296 (emphasis added). The Supreme Court was obviously thinking in such temporal terms when it declared in *McNeely* that "there would be no plausible justification for an exception to the warrant requirement" in "a situation in which the warrant process will not significantly increase the delay before the blood test is conducted" such as, *e.g.*, when "an officer can takes steps to secure a warrant while the suspect is being transported to a medical facility by anther officer." 133 S.Ct. at 1561.[21] And indeed, how long it may take the officer to get a warrant versus how long it takes to transport the suspect to a "sanitary place" where a qualified technician can draw his blood should be the paramount consideration when balancing the State's interest to preserve evidence against the privacy interests of the first- or second-time DWI offender.

But immediacy is not the only factor that the Supreme Court has recognized as relevant to the determination whether the destructibility of evidence may justify a warrantless search. In *Welsh v. Wisconsin*, 466 U.S. 740 (1984), police with probable cause to believe that Welsh had been driving while intoxicated entered his home and seized him without a

---

[21] *See also*, *id*. at 1574 (Roberts, C.J., concurring and dissenting) ("Simply put, when a drunk driving suspect fails field sobriety tests and refuses a breathalyzer, whether a warrant is required for a blood draw should come down to whether there is time to secure one.").

warrant. The State argued that the officers' decision to proceed without a warrant was reasonable because evidence of intoxication would have been lost had the police not acted with dispatch. Welsh had been cited for a prior DWI offense, but Wisconsin law made a second offense no more than a misdemeanor, and the arresting officers were unaware of Welsh's first offense in any event. *Id*. at 746 & n.6.[22] The question was whether the combination of probable cause and the need to preserve evidence of Welsh's intoxication were sufficient to justify the police conduct in arresting him in his home without first obtaining a magistrate's imprimatur, notwithstanding the relative lack of importance that Wisconsin law assigned to his offense.

The Supreme Court held that a warrant was required. "Our hesitation in finding exigent circumstances, especially when warrantless arrests in the home are at issue," the Court explained, "is particularly appropriate when the underlying offense for which there is probable cause to arrest is relatively minor." *Id*. at 750. The Supreme Court went on to "hold that an important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense for which the arrest is being made." *Id*. at 753. Wisconsin did not regard first- and second-time DWI offenders as constituting a particular societal threat, the Supreme Court observed, and "[g]iven this expression of the State's interest, a warrantless home arrest cannot be upheld simply because evidence of [Welsh's] blood-alcohol level might have dissipated while the police obtained a warrant." *Id*. at 754.

---

[22] "Indeed," the Supreme Court pointed out, "the statute continues to categorize a first offense as a civil violation that allows for only a monetary forfeiture of no more than $300." *Id*. at 746.

If, as *Welsh* held, the "gravity of the underlying offense" is "an important factor" in the exigent circumstances calculus, then it should be applied even-handedly. That is to say, if the minor nature of an offense militates *against* the reasonableness of a warrantless seizure in the home, even with probable cause and reason to fear the imminent loss of evidence, then an offense of greater magnitude, such as a third-time DWI,[23] should militate in *favor* of the reasonableness of a warrantless search of the person—especially when evidence will be lost or seriously compromised in the time it would take to secure the warrant.[24] By this I do not mean to suggest that the seriousness of an offense, by itself, should ever amount to an exigent circumstance sufficient to exclude the need for a warrant; far from it. Such a holding would

---

[23] *See* TEX. PENAL CODE § 49.09(b)(2) (three-time offender guilty of a third degree felony).

[24] Subsequent case law has bolstered my understanding of *Welsh*. In *Illinois v. McArthur*, 531 U.S. at 335-36, the case in which the Supreme Court held that a warrantless seizure of a home was "reasonable" for the time it would take to obtain a search warrant, it applied the principle at work in *Welsh* to reach the opposite result: that, because McArthur's offense was more serious, and the intrusion less invasive, the temporary seizure of his home was reasonable. In *Brigham City, Utah v. Stuart*, 547 U.S. 398 (2006), the question was whether "police may enter a home without a warrant when they have an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury." *Id*. at 400. In answering that question in the affirmative, the Supreme Court justified reaching a different result than it had in *Welsh* because the emergency in *Stuart* involved "*ongoing* violence occurring *within* the home." *Id*. at 405. Thus, the offense was both more serious and more imminent than the one involved in *Welsh*. These cases are consistent with *Welsh*'s central holding that the "gravity of the offense" is "an important factor to be considered when determining whether an emergency exists[.]" *Welsh*, 466 U.S. at 753. And, in *Stanton v. Sims*, 134 S.Ct. 3 (2013), a civil rights case involving an issue of qualified immunity for a pursuing police officer, the Supreme Court held that *Welsh* did not purport to apply in the context of the so-called "hot pursuit" exception to the warrant requirement, and does not unequivocally stand for the proposition that an officer cannot enter the curtilage of a home without a warrant when he is in hot pursuit of a "jailable misdemeanor" offender. *Id*. at 4, 6. Nothing about *Stanton* serves to refute *Welsh*'s thesis that the gravity of the offense is an important factor in the exigent circumstances analysis.

largely eviscerate the warrant requirement. But when there is a realistic danger that evidence may be lost, and the balance of interests between the State and the suspect is otherwise in equipoise, the degree of seriousness that the State has attributed to a particular offense may serve, as it did in *Welsh*, to tip the exigency scale.

What is more, as the gravity of the offense increases, so too does the need to preserve, not just some evidence of intoxication, but the very best evidence that may reasonably be obtained. Nobody disputes the "evanescent" character of blood alcohol concentration. Blood drawn at any time after the fact will not precisely reflect the blood alcohol concentration ("BAC") at the time of the offense. As we observed in *Mata v. State*, 46 S.W.3d 902, 909 (Tex. Crim. App. 2001):

> As alcohol is consumed, it passes from the stomach and intestines into the blood, a process referred to as absorption. When the alcohol reaches the brain and nervous system, the characteristic signs of intoxication begin to show. * * * At some point after drinking has ceased, the person's BAC will reach a peak. After the peak, the BAC will begin to fall as alcohol is eliminated from the person's body. The body eliminates alcohol through the liver at a slow but consistent rate.
>
> * * *
>
> [I]f a driver is tested while in the absorption phase, his BAC at the time of the test will be higher than his BAC while driving. If tested while in the elimination phase, his BAC at the time of the test could be lower than while driving, depending upon whether he had reached his peak before or after he was stopped.

We went on in *Mata* to emphasize that, "given the studies, other concepts seem indisputable, including that . . . a test nearer in time to the time of the alleged offense increases the ability

to determine the subject's offense-time BAC[.]" *Id*. at 916. In similar vein, the Supreme Court has also noted that, "because an individual's alcohol level gradually declines soon after he stops drinking, a significant delay in testing will negatively affect the probative value of the results." *McNeely*, 133 S.Ct. at 1561. And "longer intervals may raise questions about the accuracy of the [BAC] calculation." *Id*. at 1563. The upshot is that the more time that goes by before an arresting officer is able to draw a DWI suspect's blood for BAC testing, the less convincing the State's evidence of intoxication will be.

The prospect that taking the time to seek a warrant will "negatively affect the probative value" of the State's evidence in an ordinary DWI case, the Supreme Court held in *McNeely*, does not support a *per se* acceptance of the destruction of evidence as an exigent circumstance to excuse a warrant in every case. *Id*. But when it comes to the incorrigible DWI offender, the State's interest in presenting the most persuasive evidence it possibly can is much greater than in the ordinary DWI prosecution. In this context, "the metabolization of alcohol in the bloodstream and ensuing loss of evidence" is just as inevitable, *id*., but the resultant exigency is far more dire, for it hampers society's ability to protect itself from the very worst of DWI offenders—those who have proven themselves most likely to perpetrate future injury and property damage. Any delay that follows from requiring the arresting officer to stop and assess the feasibility of obtaining a warrant first will be that much more consequential. In short, in the prosecution of an incorrigible DWI offender, "second-best evidence" simply will not suffice to adequately satisfy the State's interests. *See id*. at 1571

(Roberts, C.J., concurring and dissenting) ("The need [to search for evidence of BAC] is no less compelling because the police might be able to acquire second-best evidence in some other way.").[25]

Nor is it satisfactory, as in the ordinary DWI case, to say that there may well be some cases in which it will take no longer to obtain a warrant than to convey the incorrigible DWI suspect to the "sanitary place" required by the statute for blood extraction. *See id*. at 1561 ("no plausible justification" for failing to seek a warrant where "the warrant process will not significantly increase the delay"); *id*. at 1572 (Roberts, C.J., concurring and dissenting) ("There might, therefore, be time to obtain a warrant in many cases."). That will undoubtedly be possible on occasion. But the cases will be few and far between in which it will be readily apparent to the arresting officer that to seek a search warrant will not significantly diminish the quality of the evidence because he can obtain the evidence in the same or less amount of time than it would take him to secure the warrant.

There are simply too many variables in any given encounter for an officer to have to worry about quickly parsing the circumstances to make a constitutionally acceptable judgment call. And while the "factors favoring a search will not always be present, . . . the balancing of interests must be conducted with an eye to the generality of cases" and must "take account of these practical realities." *Houghton*, 526 U.S. at 305-06. Indeed, "[t]he

---

[25] In the context of the incorrigible DWI offender, we should take to heart Justice Thomas's assertion: "Police facing inevitable destruction situations need not forgo collecting the most accurate available evidence simply because they might be able to use an expert witness and less persuasive evidence to approximate what they lost." *Id*. at 1578 n.2 (Thomas, J., dissenting).

calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Kentucky v. King*, 131 S.Ct. 1849, 1860 (2011) (quoting *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)). When obtaining the best evidence is imperative because the suspect is a proven incorrigible DWI offender, "[a] rule that requires officers (and ultimately courts) to balance transportation delays, hospital availability, and access to magistrates is not a workable rule [since] natural processes inevitably destroy the evidence with every passing minute." *McNeely*, 133 S.Ct. at 1578 (Thomas, J., dissenting).[26]

## CONCLUSION

At least with respect to incorrigible DWI offenders, the Fourth Amendment does not require that the general balancing of competing interests occur at the level of the individual search, *McNeely* notwithstanding. In Section 724.012(b)(3)(B) of the Transportation Code, the Legislature has determined that a search of the incorrigible DWI offender's blood *must* be conducted. By implication, it has also determined that the blood must be drawn even in the absence of a search warrant. Thus, the Legislature itself has conducted the necessary

---

[26] *See also, e.g.*, *Randolph*, 547 U.S. at 121-22 (refusing to fashion a rule requiring police to seek out the co-occupant of a home in order to determine whether he might object to another co-occupant's consent to a search of the premises because this "would needlessly limit the capacity of the police to respond to ostensibly legitimate opportunities in the field" and would "impose a requirement, time consuming in the field and in the courtroom, with no apparent systemic justification"). Forcing a police officer to pause to consider whether, under the circumstances of the particular case, he is likely to be able to obtain a search warrant in the same or less amount of time as it would take to convey his incorrigible DWI suspect to a "sanitary place" for blood extraction imposes a similarly counterproductive requirement.

balancing analysis to determine that such a warrantless search will always be "reasonable" under the Fourth Amendment. We should respect that legislative judgment if it is not inconsistent with Fourth Amendment reasonableness.

When I do the balancing myself, I agree with the legislative judgment that, as long as a blood draw is carried out in strict accordance with the statutory criteria, it may categorically be regarded as constitutionally reasonable even without a warrant. While even the incorrigible DWI offender enjoys a substantial interest in preserving both the integrity of his body and the limited private information that a search for intoxicants in his blood may reveal, he has no absolute right to prevent such a search, so long as it is "reasonable" under the Fourth Amendment.[27] By contrast, the State has a compelling interest to put a stop to incorrigible drunk drivers, to do so with the best evidence it can possibly obtain, and to do so without requiring police officers to scrutinize each case individually to determine whether they can accomplish that imperative in the same or less time than it would take to process a warrant. Finally, so long as the statutory conditions precedent to the search are met, requiring 1) probable cause to arrest for driving while intoxicated, and 2) reliable proof of two prior DWI convictions, a magistrate's independent evaluation contributes little to further guarantee the objective reasonableness of the search.

I conclude that, on balance, a warrantless blood draw and analysis that is carried out

---

[27] *See, e.g.*, *Riley*, 134 S.Ct. at 2493 ("Our holding, of course, is not that the information on a cell phone is immune from search; it is instead that a warrant is generally required before such a search, even when a cell phone is seized incident to arrest.").

under the terms prescribed by the statute will always prove to be reasonable for Fourth Amendment purposes.[28] The statute, when properly complied with, will operate constitutionally in all of its applications, including as applied to Appellee in this case. Both the court of appeals and this Court on original submission erred, in my view, to hold otherwise. Rather than simply rescind our earlier order granting the State's motion for rehearing, the Court should take a second look and endorse the considered legislative judgment that any warrantless search conducted under the conditions set by Section 724.012(b)(3(B), will prove constitutional.[29]

I respectfully dissent.

FILED:        December 16, 2015

---

[28] I do not mean to suggest that any one of the State's interests discussed above would suffice, by itself, to justify a warrantless blood draw under the statute. Rather, it is the combination of State's interests—the general interest to deter driving while intoxicated, the gravity of the offense of felony driving while intoxicated, the interest in preventing recidivism (and particularly, incorrigible driving while intoxicated), and the heightened interest in obtaining the best possible evidence against such offenders before it naturally and inevitably dissipates—that serves categorically to outweigh the incorrigible DWI offender's privacy interest.

[29] One final note: I wish to make it clear, if it is not already, that I am not advocating for some heretofore unheard-of exception to the general warrant requirement in cases involving criminal investigations. On the contrary, it is my whole thesis that, under a general balancing approach to Fourth Amendment "reasonableness," the scope of an already existing exception—the exigent circumstances exception—to the warrant requirement properly extends to authorize automatic blood draws for incorrigible DWI offenders when the terms of the statute are satisfied. As recently as in *Riley*, the Supreme Court conducted such an analysis to determine whether a particular type of warrantless search was justifiable as a search incident to arrest. 134 S.Ct. at 2484-91. Here, after pursuing a similar analysis, I conclude that the Legislature has identified an application of the exigent circumstances exception that will always be reasonable and has simply codified it. Because I agree with the Legislature that this application of the exigent circumstances exception will operate in a constitutionally reasonable manner for Fourth Amendment purposes, I would reverse the judgment of the court of appeals.

PUBLISH